UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD W. SUNDER, | ) | |
| LOUIS R. JARODSKY, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV01153 ERW |
| | ) | |
| U.S. BANK PENSION PLAN, | ) | |
| | ) | |
| Defendant(s). | ) | |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on a bench trial held on March 14, 2007.

## **I. FINDINGS OF FACT**

Edward William Sunder, III ("Mr. Sunder") was a Portfolio Manager with Mercantile Bank ("Mercantile")[1] when he resigned on August 28, 2000. He then went to a division of Firstar, a successor purchaser of Mercnatile, where "we started an investment subsidiary called Missouri Valley Partners;" he remains, doing the same work[2] he did at Mercantile. He has a B.A. Degree in Business and Economics from Drury College, Springfield, Missouri and is a Chartered Financial Analyst ("CFA"). One month after graduating from Drury College, Mr. Sunder began his thirty-one year career with Mercantile Bank in the summer of 1969. About six years after beginning his employment, he acquired the CFA certification which he describes as "being akin to a C.P.A." Originally, Mr. Sunder worked in the Investment Research Department at Mercantile

---

[1] Mr. Sunder actually resigned from Firstar which purchased Mercantile.

[2] This work involves making long-term investments.

1

where he "followed numerous industries and companies for investment purposes for trust customers, both institutional and individual customers . . ." He "followed both stocks and bonds and made recommendations as to what they should buy and sell and things of that nature." (Tr. p. 6, l.4-17). Mr. Sunder performed these services for about thirteen years. In 1982, he moved to the Portfolio Management Department. Individuals in that Department take buy and sell recommendations from the research department, applying them to individually managed portfolios. Among the portfolios he managed for most of the eighteen years he worked in this Department was the Mercantile Retirement Account. Financial Services relied upon by him in his work include present value compound interest table book, publications that identify U.S. Treasury rates, Bloomberg and Baseline, Thompson Financial Baseline Service and Reuter's Bridge.

During his employment with Mercantile, Mr. Sunder became a participant in the Mercantile Defined Benefit Retirement Plan, expecting it would provide a monthly benefit at the time of his retirement, based on years of service and income level. The Plan changed in the late 1970's or early 1980's "to tie into Social Security." Originally the plan provided for "essentially 2 percent for each year of service to a maximum of 60 percent." The Plan was later changed to a maximum benefit of 50 percent to coordinate with Social Security. These terms encompassed the "Old Plan" which was in effect until the end of 1998.

Mercantile had a 401(k) self-directed Defined Contribution Plan originally started as a profit sharing plan which was later converted in the 1990's. It provided for Mercantile to make a contribution, based on an individual's earnings and on profitability of the Bank. Mercantile matched individual contributions "50 cents on the dollar to a certain limit . . . ." Investment choices of employees included investing in stocks, bonds and mutual funds. The individual

employee assumed investment risk in the self-directed Defined Contribution Plan.

The Old Plan was a fixed income plan, not a 401(k) plan; i.e. it was not self-directed. The Old Plan provided for a fixed amount on retirement, on a monthly pay-out basis. In 1998 or early 1999, the administrator of the Plan at Mercantile announced, by sending letters to all employees, that the Old Plan was being converted to a Cash Balance Plan. The letter showed the opening balance of the individual's plan as of the opening date. Mr. Sunder's monthly benefit at age 65 was shown to be $5,222.14. (Pl. Ex. 7). He received a statement in early 1999 advising him that under the new plan, his cash balance as of January 1, 1999[3] would be $428,211.11. (Tr. p. 20, l.11-16) (Pl. Ex. 10). Mr. Sunder concluded that the stated value seemed low to him, so he contacted Mr. Tepen, author of the exhibits, and asked for information as to the discount rate used to calculate the stated balance due. Mr. Sunder testified that Mr. Tepen said that a discount rate of 8 percent was used for individuals "over 45 or something like that and 7 percent for people 45 and under." (Tr. p. 21, l. 1-8). Mr. Sunder expressed dissatisfaction with use of the 8% rate as being too high, since the "going rate of interest was in the 5, 5-1/2 percent area, and that the amount that we were being paid on those funds was the ten-year Treasury with a minimum of 5-1/2 percent." (Tr. p. 21, l. 16-19). Mr. Sunder understood that the cash balance figure was equivalent to what his lump sum payment would be if he withdrew from the plan, and that it was his right to take everything by lump sum, but that discounted amount would be what he would receive. As of November 30, 1998, the 30-year Treasury bond rate was 5.09 percent. (Pl. Ex. 30). Mr. Sunder testified that a one-percent reduction in the discount rate would equal about a

---

[3] The exhibit states at the top of the page, "Statement as of January 1, 2000" but the text of the exhibit states that the balance as of January 1, 1999 is $428,211.11.

ten-percent increase in the distributed cash balance. Mr. Sunder did not participate in Mercantile's calculation of his lump sum distribution in the year 2000, but on cross-examination, he did not dispute that the discount rate actually used by Mercantile was the statutory 417(e)(3) interest rate in calculating the various forms of benefit available to him in 2000 which was 6.07 percent. (Tr. p. 25, l. 3-25). Mr. Sunder also agrees that as of January 1, 1999 he had not yet reached the age of 55, and that it was possible that the cash balance calculated in Plaintiff's Exhibit 10, as of January 1, 1999 had a substantial early retirement subsidy built into that cash balance account, but it is hard for him to know that. (Tr. p. 26, l. 13-24). He understands that he was not eligible for early retirement subsidy under the previous Mercantile plan that was in place before the Cash Balance Plan became effective. Mr. Sunder admits that Plaintiffs' Exhibit 7 is based on a monthly annuity at age 65, and that he took his benefits at age 53, as permitted under the new cash balance plan.

Louis R. Jarodsky ("Mr. Jarodsky") has a Bachelor of science degree in social studies and social sciences. He worked at General Motors Institute where he was certified in Automotive Business Management. He began working for Mercantile in November, 1978. His last position with Mercantile was manager with the investment subsidy, Mississippi Valley Advisors, until he took early retirement in August, 2000. Before he retired, Mr. Jarodsky was a participant in Mercantile's Traditional Defined Benefit Plan, or, the Old Plan. He made a request to Eric Tepen, of the Human Resources Department at Mercantile, as to an estimate of what his monthly retirement benefits might be under the Old Plan, as of February 1, 2000, his fifty-fifth birthday, at a time when he was contemplating early retirement at age 55. This request was made before he knew about the Cash Balance Plan. Mr. Tepen responded in a letter dated April 15, 1998, stating

4

that Mr. Jarodsky's monthly benefit as of February 1, 2000, would have been "$2,984.77 and then there was a supplemental retirement at $3,488.80." (Tr. p. 32, l. 10-22). The $2,984.77 figure was based on an estimate that Mr. Jarodsky would have continued employment at Mercantile with the kind of earnings he had up to the time of the letter. He did, in fact, continue his employment through February 1, 2000, with at least the same earnings, or more, than he had earned before April 15, 1998.

In January 2000, Mr. Jarodsky made the same request for information he had made in 1998, but by this time, Mercantile had adopted the Cash Balance Plan. (Pl. Ex. 22). Mr. Jarodsky called Mr. Tepen to request what the monthly benefit would be. He was told, in a letter dated February 16, 2000, that the monthly benefit would be $2,657.23, not $2,984.77, the monthly benefit amount Mr. Tepen had told Mr. Jarodsky he would be entitled to receive in the April 15, 1998 letter, under the old plan. Mr. Jarodsky had been told throughout the time the plan was being changed to the Cash Balance Plan format that "basically there would be no change." (Tr. p. 34, l. 17-19). He was told by Mr. Tepen that he was in a unique group, "that it was a function of my age and the fact that my income had risen perhaps at a slightly higher rate perhaps than maybe the average employee, and that combination resulted in that reduction." (Tr. p. 34, l. 23 - p. 28, l. 2).

In late 1998, Mr. Jarodsky received a lot of information from Mercantile on the new Cash Balance Plan. He understood that the principal difference between the Cash Balance Plan and the Old Plan was that there was an option of taking a lump sum payment or a monthly annuity amount. He said that he was under the impression that "there wasn't going to be any decline in benefits, but just basically an enhancement to the plan is basically how it was proposed, as an

5

enhancement." (Tr. p. 35, l. 12-14). Plaintiffs' Exhibit 20 is a 204(h) notice received by Mr. Jarodsky where bullet point 3 states, "[t]he total benefit earned under the old plan is guaranteed. Your opening balance will be at least as much as the value of your benefit earned under the old plan." (Pl. Ex. 20) (Tr. p. 35, l. 9 - p. 36, l. 1). Mr. Jarodsky was shown Defendant's Exhibit W on cross-examination and acknowledged that in regard to any estimated retirement benefit to which he would be entitled to receive it would be subject to this exhibit which recites, "[t]his estimate is based upon the following assumptions: . . . [n]o changes in current plan provisions." Mr. Jarodsky acknowledged that seven and one-half months after he received Mr. Tepen's April 15, 1998 letter, the plan provisions did change, and "the assumptions that Mr. Tepen was using to give you your estimate in April of 1998 did not, in fact, come true." When shown Defendant's Exhibit Y, which shows his cash balance as of January 1, 1999 of $324,820.01, and Defendant's Exhibit EE, the pension benefit election form he signed September 28, 2000, with a one-time lump distribution of his benefits of $378,813.03, Mr. Jarodsky admitted that his cash balance increased more than $54,000.00 in a year and a half when he was in the Cash Balance Plan. (Tr. p. 34, l. 24 - p. 40, l. 21).

Mr. Sunder prepared Plaintiffs' Exhibit 29 which compares the effect of using a discount rate of 8%, the rate used by Defendant, and discount rates of 6.04% and a discount rate of 5.08%. Mr. Sunder opines that by using a discount rate of 8%, when his money was being managed by Mercantile earning in the range of 5 to 5 ½%, the total amount of the lump-sum payout they received was reduced. Mr. Sunder further opines that a lower discount rate should have been used to calculate his lump sum retirement payment, which would, for him, at 6.04%, have amounted to an "impact on starting balances" for 13.5 years of $119,754.00 and for Mr.

6

Jarodsky would have been, for 11 years, a reduction of $72,687.00, or a 22% reduction for Mr. Jarodsky and a 28% reduction for Mr. Sunder . With compared discount rates of 8% and 5.09%, for 11 years for Mr. Jarodsky, the impact on starting balances would have been $113,573.00, and for Mr. Sunder for 13.5 years the figure is $189,913.00. He also made comparisons at 8% and 5.88%. (Tr. p. 42, l.17 - p.44, l.7). He confesses that in making these calculations, he does not know what percentages of opening balances are represented by including early retirement subsidies in his calculations, nor whether the opening balances were increased by more than 30 percent by inclusion of the early retirement subsidies.

Eric Tepen testified that he was employed at Mercantile from May 1994 through 2003. He administered the Mercantile's pension or retirement plan. He differentiated the Traditional Defined Benefit Plan and the Cash Balance Plan by saying the former will typically illustrate a retirement benefit as a monthly amount payable starting at age 65, while a cash balance plan remains a defined benefit plan focusing on the way the benefit is illustrated in a lump sum value. He said, "[t]he lump sum payout is equal to the cash balance accumulation at the point of determination or upon payment. It is compared to the greater value of the benefit under the traditional plan that was preserved for the participants and also compared to what we call a whipsaw calculation where we rolled the cash balance forward using the current interest crediting rate and discounting back to today's dollars using the 417(e)(3) regulations." He said that this United States Code section requires that a certain discount rate be used which is limited to a rate tied to the Treasury Note rate, and he used that rate in calculating Plaintiffs' benefits. He testified, "[a]s it turned out when as the cash balance was rolled forward, it was greater than the calculations that were prescribed by the IRS code. Therefore, they received the greater of the

7

calculations." (Tr. p. 50, l. 22-25). When asked on cross-examination if the monthly benefit in 2000, would have been higher if a lower discount rate had been used, i.e. 6% instead of 8%, he said he could not answer that question, without doing all three calculations, having first explained how that was done:

> "We look at -- to clarify, we take the cash balance, we convert that value to a life annuity. That's one comparison. We also compare what benefits were earned under the prior plan, that's a minimum. And then there's another part of the whipsaw calculation where again we compare a third component to make sure that the individual gets the highest amount."

(Tr. p. 56 l, 5-11). He was again asked about the effect of using a lower discount rate.

> Q. Well, one of the components was a higher -- would be a higher cash balance if the discount rate –
> A. One of the components would yield a higher amount.
> Q. And the other components would remain the same, wouldn't they?
> A. Yes.
> Q. So wouldn't that mean -- I'm not arguing, I'm just asking.
> A. No.
> Q. Wouldn't that mean then that figure would be higher, the monthly benefit?
> A. Yes.
> Q. Okay.

(Tr. p. 56, l. 18 - p. 57, l. 5).

Lawrence Sher ("Mr. Sher") is employed by Buck's Consultants, New York, New York, where he is a principal, actuary and Director of Retirement Policy. He graduated from Rutgers University with a degree in mathematics, has been an actuary for 34 years, and is a Fellow in the Society of Actuaries. As an enrolled actuary as designated by the Employee Retirement Income Security Act ("ERISA"), he is allowed to perform certain functions under ERISA, "notably involving the financing, minimum funding requirements of defined benefit pension plans." (Tr. p. 81, l. 13-15). The first cash balance plan of which he was aware was a conversion arrangement

from a traditional plan in 1985. He has been working with cash balance plans for 22 years. He has served as an expert witness in a number of notable cases involving cash balance plans.

The plan sponsor in this case is Defendants. The most common approach in developing an opening balance for a cash balance plan "is to take the accrued benefit that the individual had under the prior formula as of the date of conversion, which is generally expressed as an annuity beginning at the employee's normal retirement date, age 65 usually. The lump sum present value of that benefit is very often how opening balances are determined. Now, how that present value is determined varies significantly among employers." (Tr. p. 84, l. 22 - p. 85, l. 4.). In setting present values, methodologies used are described as follows:

> Well, the key assumptions that are used in determining the opening balance when it's determined as a present value are the interest rate discount, the mortality assumption, in other words, how long people are anticipated to live, as well as the retirement age assumption. And any one of those can make, you know, a difference, in some cases a significant difference in what the opening balances turn out to be.

(Tr. p. 95, l. 7-13). Mr. Sher is not aware of any requirement concerning what discount rates a plan sponsor would use to establish an opening balance. (Tr. p. 85, l. 5-17).[4] Mercantile used the present value methodology in establishing the opening balances, the most common variation that he has seen used in practice.

> They used an 8 percent discount rate. I believe it was -- there was also a 7 percent discount rate which was used, I believe, prior to retirement, all right. Prior to the assumed retirement age. So 7 percent up until the assumed -- from the current age up until the assumed retirement age and then 8 percent thereafter. So that's the

---

[4]Here is where Defendant's procedures must be challenged. Clearly, the Case Balance Plan notification provides that a participant will not receive less than under the Old Plan. By using a higher discount rate of 8%, rather than the prevailing 30-year Treasury rate at the time, the participant is not receiving the benefits guaranteed. Later in this opinion, Mr. Sher recognizes the more common approach is to use the 30-year Treasury Bond rate then in effect.

discount rate. Mortality table they used was a commonly used mortality table that also happens to be coincidentally the 417(e)(3) mortality table that was in effect at the time based on a 1983 study, Society of Actuary study. It's called the 1983 Group Annuity Mortality Table. The retirement age assumption varied depending upon the individual circumstances. My recollection is that for people who were over age 45 at the time of the conversion, that the assumption was made for this calculation that those people would retire either immediately if they were eligible, already eligible to retire. Meaning they were already over age 55 at the conversion date. Or if they were between 45 and 54, the assumption was made that they would retire at 55. Others, I believe, that is those that were under age 45, it was assumed that they would retire at age 65 for this purpose.

(Tr. p. 85, l. 23 - p. 86, l. 20).

He described the early retirement subsidy under a traditional defined benefit pension plan as follows:

"Most defined benefit plans, virtually all in my experience allow employees to retire early, that is not only can they receive benefits beginning at normal retirement age, but they can receive benefits as early as 55, in some cases even before that as specified under the plan. In many traditional defined benefit plans the annuity that an individual might be entitled to at an early retirement age could have an actuarial value greater than the actuarial value of the normal retirement annuity. You take, you know, an extreme case, and this is done every once in awhile, where there might be no discount for the fact that the individual retires and receives the benefit at age 55 as compared to 65. So in that case you can see the subsidy is you're paying somebody ten years additional pension without any charge to the pension. In other words, any reduction to the normal retirement pension. Most plans don't quite go to that extreme, but they provide a scale of reductions for early retirement. But that scale is not as steep. The reductions are not as severe as they otherwise would be if it was called an actuarial reduction.

(Tr. p. 86, l. 23 - p. 87, l. 17).

Examples were discussed to explain the early retirement subsidy:

> Q. Well, let's talk -- most plans would allow you to retire at age 65 and take the normal annuity benefit; is that correct?
> A. Yes, that's true.
> Q. And if that's $3,000 per month just by way of example, if there was no early retirement subsidy and one were to retire at age 55, one would get ten additional years payment from the plan; is that correct?

10

| | |
|---|---|
| A. | That's correct. |
| Q. | And in order to make sure that the benefit for the person retiring at age 65 equals the benefit for one retiring at age 55, the monthly benefit would be reduced for the person retiring earlier? |
| A. | That's right, so that they have equivalent value. |
| Q. | So that the two sums, one payable at age 65, one payable at age 55, are actuarially equivalent? |
| A. | That's right. So the one at 55 might, if in your 3,000 example might be 12, $1,300, something less than half. |
| Q. | Per month? |
| A. | Per month, correct. |
| Q. | And an early retirement subsidy then does what to that 12 or $1,300? |
| A. | It increases it to some extent, and that depends upon the extent of the subsidy. But it might increase the 12 or 1,300 to 1,500 to 1,800 to 2,000 or all the way in the extreme example I gave before, all the way to 3,000, although that's not too common. |
| Q. | To the best of your understanding is there any requirement that early retirement subsidies be built into a cash balance opening account? |
| A. | No. |

(Tr. p. 87, l.18 - p. 88, l. 23). Mr. Sher testified that most plan sponsors do not include a subsidy in the opening balance, however some companies do, for example, introduce a partial early retirement subsidy into opening balances by assuming a retirement age of 62, rather than 65. He said Mercantile's cash balance opening account included a factor for early retirement subsidy which he described:

| | |
|---|---|
| A. | For the people who are eligible for it, it included what I would characterize as a very generous treatment, one that I have only seen rarely in my experience in terms of early retirement subsidies. |
| Q. | And Mr. Jarodsky and Mr. Sunder, were they both beneficiaries of the inclusion of an early retirement subsidy in their opening cash balance account? |
| A. | Yes, they were. |

(Tr. p. 89, l. 21 - p. 90, l. 3).

Mr. Sher referred to page 25 of Defendant's Exhibit F to make some alternative calculations. He testified that the more common approach to determining opening balances would

11

be to use the 6% rate because at the end of 1997 the 30-year Treasury Bond rate then in effect was around 6%, and that it was the more common approach. He testified, "in my experience it has been more common to use something closer to the 30-year bond rate." (Tr. p. 90, l. 8-9). He made a comparison to what Mercantile actually used, i.e. the 8% rate. He said he understood that while he recognized that Mercantile had used the 8% rate, Mercantile's determination of opening balances had the more favorable early retirement subsidies and very favorable mortality assumption built in, actual opening balances were determined by assuming no mortality between current age and the age at which they were assumed to retire, in this case, 55. While he said that Mr. Jarodsky received about 50% more and Mr. Sunder about 65% more, than by commonly used assumptions at the time, on cross-examination, he was unwilling to say that the two applicants, Plaintiffs herein, "when all was said and done, were better off under the cash balance plan than they were under the old plan." (Tr. p. 101, l. 1-3). Mr. Sher responded:

> Q. All right. You did say that the amounts that they received would be higher, didn't you?
> A. What I said was is that the opening account balances were higher than they otherwise would have been under what I viewed as a more common approach for determining opening balances.
> Q. Oh, I see, all right. But the opening balance in this case was determined by the use of discount rate of 8 percent, right, and early retirement benefits among other things. But those were -- wouldn't you say that those were the two primary telling factors on what the opening balance wound up being?
> A. Yes. You have mortality as well, but I would say those were the two major factors, correct.

(Tr. p. 101, l. 9-22).

## II. PROCEDURAL HISTORY

On February 16, 2007, this Court ruled on Defendants' Motion for Summary Judgment; the Court granted in part and denied in part Defendants' Motion. In that order, the Court stated

12

that the only question remaining for trial was whether Defendant used the appropriate discount rate in calculating Plaintiffs' lump sum payouts. A bench trial was conducted on this limited question. Following the bench trial, the Parties submitted post-trial briefs. The Parties' post trial briefs made clear that there is no factual dispute regarding the discount rates used in determining Plaintiffs' opening balances and final payouts. It is clear that the statutory rate was used in determining Plaintiffs' final payouts, and an 8% rate was used to determine Plaintiffs' opening balance. Defendants therefore seek a ruling in their favor, that the rate used in determining Plaintiffs' lump-sum payout was lawful. Plaintiffs' do not dispute that the interest rate used to determine the lump-sum payout was lawful, however, they ask this Court to reconsider the question of the discount rate used in determining Plaintiffs' opening balances. While the Court recognizes that this question was previously decided, the Court has the authority to reopen those matters decided on summary judgment.[5] Therefore, the Court will address both the lawfulness of

---

[5]The federal rules provide that a court may reconsider a prior judgment or order for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due dilligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b). Plaintiffs' request, that this Court reconsider its summary judgment ruling, stating that it may be properly reviewed under either Rule 60(b)(1), that the Court made a mistake in granting judgment to Defendants on this point, or alternately, under Rule 60(b)(6), the general provision that a judgment or order may be reconsidered for "any other reason justifying relief . . . ." *Id.* If the Court was premature in granting judgment in favor of Defendants on the question of opening balances, then the Court has an obligation to rectify that mistake, before a final judgment is entered in this case.

the discount rate used in determining Plaintiffs' opening balances, and the rate used in determining Plaintiffs' lump-sum distributions upon retirement.

## III. CONCLUSIONS OF LAW

ERISA requires that a vested benefit, which is paid in the form of a lump-sum distribution prior to normal retirement age, be worth no less than the actuarial equivalent of the participant's accrued benefit. 29 U.S.C. §1054(g); *see also* 26 U.S.C. § 411(c)(3) ("[I]n the case of a defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit . . . ."); *see also Esden v. Bank of Boston*, 229 F.3d 154, 164 (2nd Cir. 2000) ("Because the plan is a defined benefit plan, any distribution from the plan must be the actuarial equivalent of the accrued benefit expressed as an annual benefit payable at normal retirement age . . . ."). In order to determine the actuarial equivalent in a cash balance plan, the cash balance must be projected forward and then discounted back to present value. "[T]he regulations do not leave a plan free to choose its own methodology for determining the actuarial equivalent of the accrued benefit expressed as an annuity payable at normal retirement age." *Esden*, 229 F.3d at 164. As the Second Circuit so succinctly stated, "[i]f plans were free to determine there own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'" *Id.*

The treasury regulations promulgated in accordance with ERISA provide the requisite assumptions and methodology to be used when determining the value of an accrued benefit from a defined benefit plan. *Esden*, 229 F.3d at 164.

> A defined benefit plan must provide the present value of any accrued benefit and the amount (subject to sections 411(c)(3) and 415) of any distribution, including a single sum, must not be less than the amount calculated using the applicable interest rate described in paragraph (d)(3) of this section (determined for the month described in paragraph (d)(4) of this section) and the applicable mortality table described in paragraph (d)(2) of this section.

Treas. Reg. § 1.417(e)-1(d)(1); *see also* 26 U.S.C. § 417(e)(3) (Internal Revenue Code Section that is interpreted in Treasury Regulation Section 1.417(e)-1(d)). Paragraph (d)(3) describes the applicable interest rate as "the annual interest rate on 30-year Treasury securities as specified by the Commissioner for that month." Treas. Reg. § 1.417(e)-1(d)(3).

### A. Lump-Sum Distributions

The Parties do not dispute that the 30-year Treasury rate, applicable at the time Plaintiffs received their distributions from the plan, was 6.07%.[6] Furthermore, the Parties do not dispute that this rate was used in determining Plaintiffs lump-sum distributions. Therefore, the Court concludes Defendants are entitled to judgment on Plaintiffs' claim that Defendant's calculation of Plaintiffs' lump-sum distributions violated ERISA. It is clear from the testimony at trial, that Plaintiffs lump-sum distributions were properly calculated using the 6.07% interest rate, and therefore Defendant is entitled to Judgment on this Claim.

### B. Opening Balance

However, Plaintiffs and Defendant disagree over the use of a higher interest rate, 8%, in

---

[6] The terms of the Plan provided that the interest rate used would be the average annual rate of interest on 30-year treasury securities for the month of September in the year immediately preceding the first day of the plan year containing the date of distribution. The date of distribution in the case at bar was October 31, 2000, and therefore the applicable month was September, 1999. The average rate for September, 1999, was 6.07%.

15

determining Plaintiffs' opening balances.[7] Defendants argue that § 417(e)(3) applies only to restrictions on cash outs and distributions, and that ERISA does not require the use of a specific discount rate in determining the opening balance.[8] Plaintiffs urge the Court to reconsider its prior ruling, and find that the January, 1999, opening balance is synonymous with the lump sum benefit, and therefore must satisfy the regulation's requirements. It is undisputed, that when Defendant calculated Plaintiffs' opening balances, it projected Plaintiffs' lifetime annuity to age sixty-five using an interest credit rate of 6.07%, and then discounted back to present value using an 8% discount rate. The key question for this Court to decide is whether the statutory requirement that a plan use 30-year treasury rate in calculating lump-sum distributions is equally applicable to a determination of Plaintiffs' opening balances; the Court concludes that it is.

ERISA allows for a plan sponsor to freely amend a retirement plan, as long as no accrued benefits are divested. An accrued benefit in a traditional defined contribution plan is an annual benefit commencing at normal retirement age. Upon conversion to a cash balance plan, the Defendant was obligated to protect Plaintiffs' accrued benefit in determining Plaintiffs' opening balance under the new Plan. 26 U.S.C. § 417(c)(3) provides that if an accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, it must be the actuarial equivalent of such benefit. *See also Edson*, 229 F.3d at 164. As stated by the Second Circuit in *Edson*, and made clear by the regulations, the actuarial equivalent is

---

[7]Defendant initially argues that Plaintiffs are barred from raising this argument due to this Court's summary judgment ruling. However, as articulated above, the Court, in its discretion, may reconsider its Summary Judgment ruling, and therefore shall address the merits of Plaintiffs' argument.

[8]This was the conclusion that this Court reached in its prior Summary Judgment order.

determined by using the methodology provided by regulation, and not a methodology determined by the plan sponsor. 229 F.3d at 164; *see also* Treas. Reg. § 1.417(e)-1(d). Therefore, the conversion of an accrued benefit from a lifetime annuity to a cash balance is not left solely to the discretion of the plan sponsor.

It is essential, in assessing the legality of Defendant's actions, to recognize that accrued benefits and expected future benefits are distinct, and are treated very differently under ERISA. Specifically, expected future benefits are not protected under the statute, where as accrued benefits are protected. As the First Circuit in *Cambell v. BankBoston, N.A.*, clearly stated, the controversy surrounding cash balance plans arises from the transition from a traditional plan to a cash balance plan. 327 F.3d 1, 8 (1st Cir. 2003). "Older workers, such as Campbell [plaintiff], expected to see their pension benefits rise dramatically as a result of their service just before retirement. Instead, as a result of their companies' adoption of cash balance plans, their pension increases under the old plans ceased." *Id.* However, this cessation of increased benefits does not equate to a divestiture of accrued benefits. Plaintiffs point to letters that Plaintiffs received regarding their expected retirement benefits, both before and after the conversion of the plan to a cash balance plan. Plaintiffs correctly point out that the expected benefits were lower under the new plan.[9] However, as this Court stated in its summary judgment order, this is only relevant if it shows that an accrued benefit was decreased under the new plan. *See* 29 U.S.C. § 1054(g). The letters provided by Plaintiffs show only that expected benefits decreased, and is not relevant to the

---

[9]Plaintiff Jarodsky received a letter, dated April 15, 1998, which stated that his monthly annuity payable at a commencement date of February 1, 2000, was $2,984.77 per month. On February 16, 2000, Plaintiff Jarodsky received a second letter which stated that his life annuity was $2,657.23 per month.

17

Court's determination of whether the opening balance divested Plaintiffs of accrued benefits.

Defendant asserts that regardless of the methodology used to determine opening balances, Plaintiffs' accrued benefits were protected because Plaintiffs were guaranteed the greater of either their cash balance converted to a life annuity, the benefits earned under the prior plan, or the whipsaw calculation. (Tr. 561:5-11). Defendant admits that using a lower discount rate, the 30-year treasury rate as opposed to the 8% actually used, would have yielded a higher opening balance, but Defendant disputes that such discrepancy is legally significant. Defendant's statement would only protect Plaintiffs' accrued benefits if Plaintiffs had immediately sought a distribution from the plan, as over time additional credits are added to the opening balance.

Defendants assertion that the opening balance was just one calculation done in determining Plaintiffs' lump-sum distributions is unpersuasive. The opening balance was intended to represent Plaintiffs' accrued benefits under the old plan. By using a high discount rate Plaintiffs' accrued benefits were not protected. All future benefits under the new plan were added to the original opening balance in the form of interest and pay credits, these additional payments into Plaintiffs' hypothetical accounts, cannot be used to justify Defendant's failure to properly protect accrued benefits. At the point of distribution, an individuals' cash balance would almost always be greater than those benefits under the old plan, due to the addition of interest and pay credits, however such a comparison is incorrect. As Mr. Sher testified at trial, had Plaintiffs retired immediately upon conversion from the old plan to the new plan, Plaintiffs' opening balances would have been their lump-sum distribution. Therefore Plaintiffs' opening balance, and not only their lump-sum distribution, must comply with ERISA's statutory requirements. The Court finds that the use of an 8% discount rate resulted in the loss of accrued benefits in violation

of ERISA.

## IV. CONCLUSION

The Court concludes that the decision entered in this Court's summary judgment motion was incorrect. Upon hearing the evidence at trial, and reviewing the Parties' post-trial briefs, the Court concludes that Defendant was required to use the statutory interest rate in determining Plaintiffs' opening balances, in order to protect Plaintiffs' accrued benefits. The failure of Defendant to use the statutory rate allowed Defendant to drastically reduce the value of Plaintiffs' accrued benefits, contrary to ERISA's express provisions. Therefore the Court orders that Defendant recalculate Plaintiffs' opening balances using the statutory rate, and not the 8% rate used by Defendant, and credit Plaintiffs with the difference, plus interest from the date of conversion. Once this computation has been made Defendant shall submit it to the Court for final approval.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs Sunder and Jarodsky are entitled to Judgment against Defendant U.S. Bank Pension Plan. Defendant U.S. Bank Pension Plan will re-compute Plaintiffs' Opening Balances using the 30-year treasury rate at the date of conversion.

**IT IS FURTHER ORDERED** that Defendant U.S. Bank Pension Plan will pay Plaintiffs the difference between the original computation, and the new computation performed using the statutory interest rate, and interest on such sum from the date of conversion, January 1, 1999, until the date of this Judgment.

**IT IS FURTHER ORDERED** that Defendant will provide the Court with a copy of all computations for this Court's approval, no later than thirty (30) days from the date of this judgment.

So Ordered this <u>24th</u> Day of <u>September</u>, 2007.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE